Christopher GUSTAFSON, Plaintiff,

v.

BAC HOME LOANS SERVICING, LP, et al., Defendants.

No. SACV 11–915–JLS (ANx).

United States District Court, C.D. California.

Nov. 4, 2013.

---

33. OSC at 5.

34. Rosen Decl., Exh. 3.

Adam M. Stewart, Edward F. Haber, Shapiro Haber and Urmy LLP, Boston, MA, Amanda Trask, Donna Siegel Moffa, Edward W. Ciolko, Jesse Klaproth, Peter A. Muhic, Terence S. Ziegler, Kessler Topaz Meltzer and Check LLP, Radnor, PA, Brad E. Seidel, Chad E. Ihrig, Christopher R. Johnson, Jeffrey J. Angelovich, Michael B. Angelovich, Nix Patterson and Roach LLP, Austin, TX, Daniel L. Germain, Rosman and Germain LLP, Encino, CA, E. Michelle Drake, Joseph C. Hashmall, Rebekah L. Bailey, Nichols Kaster PLLP, Minneapolis, MN, for Plaintiff.

Brian M. Lamacchia, David S. Kantrowitz, Matthew G. Lindenbaum, Goodwin Procter LLP, Boston, MA, David L. Permut, Katherine J. Shinners, Goodwin Procter LLP, Washington, DC, Laura Alexandra Stoll, Goodwin Procter LLP, Los Angeles, CA, Fredrick S. Levin, BuckleySandler LLP, Santa Monica, CA, Jennifer A. Slagle–Peck, Robyn C. Quattrone, BuckleySandler LLP, Washington, DC, for Defendants.

### ORDER DENYING CLASS CERTIFICATION

JOSEPHINE L. STATON, District Judge.

Before the Court is Plaintiffs' Motion for Class Certification ("Motion"). (Mot., Doc. 269–1.) Defendants Bank of America, N.A., Banc of America Insurance Services Inc. (collectively, the "Bank of America Defendants"), Balboa Insurance Co. ("Balboa"), Meritplan Insurance Co., and Newport Management Corp. filed Oppositions. (Bank of America Defendants' Opp'n ("BANA Opp'n"), Doc. 288; Balboa, et al. Opp'n ("Balboa Opp'n"), Doc. 292.) Plaintiffs replied. (Reply, Doc. 308.) Defendants filed a sur-reply. (Doc. 315.) Having considered the parties'

papers and heard oral argument, the Court DENIES Plaintiffs' Motion.

## I. BACKGROUND

Plaintiffs filed this proposed class action on June 17, 2011, challenging various aspects of the Defendants' force-placed insurance ("FPI") practices. The crux of Plaintiffs' case is that Defendants engaged in a scheme to "force [ ] place hazard insurance coverage under [ ] mortgage loans to further impose unauthorized and excessive charges on Class members." (Mot. at 1.)

Defendant Bank of America, N.A. ("BANA") is a subsidiary of Bank of America Corporation and is a servicer of mortgage loans.[1] (Mot. at 6.) Servicers are "required to administer the day-to-day activities" associated with the mortgage, including interfacing with borrowers and monitoring homeowners' insurance coverage. (Siegel Decl. Ex. 2 ("Wyatt Report") at 4, Doc. 273.) BANA services mortgage loans on behalf of itself, public investors, and approximately 370 private investors. (BANA Opp'n at 4; Shinners Decl. Ex. 31 ("McFarland Decl.") ¶¶ 7, 9, Doc. 297–5.) In July 2008, when Bank of America Corp. acquired Countrywide Home Loans, Inc. ("Countrywide"), BANA also took over servicing of Countrywide's 10–million loan portfolio. (BANA Opp'n at 3 n. 2; Shinners Decl. Ex. 5 ("Loriot Decl.") ¶ 11, Doc. 297–1.) Thus, from 2007 to 2011, BANA serviced three separate mortgage loan portfolios: (1) the nearly 10 million loans originally serviced by Countrywide ("legacy Countrywide"); (2) the nearly 2 million loans serviced by Bank of America prior to the acquisition of Countrywide ("legacy Bank of America"); and (3) loans originated by Bank of America after July 2008. (id.; Shinners Decl. Ex. 19 ("Peterson Depo.") at 118:12–15, Doc. 297–4.) BANA currently services mortgages under approximately 3,600 agreements. (Shinners Decl. Ex. 31 ("McFarland Decl.") ¶¶ 7–9, Doc. 297–5.)

Under the mortgage contracts serviced by BANA, borrowers are required to maintain hazard insurance on their properties to pro-tect the lender's interest. (Third Am. Compl. ("TAC") ¶ 2, Doc. 146; id. Ex. 3 ¶¶ 9, 10, Doc. 146–1–146–2; id. Ex. 4 ¶¶ 9, 10, Doc. 146–2.) If a borrower fails to maintain hazard insurance, these mortgage contracts authorize the lender to obtain or "force [ ] place" hazard insurance at the borrower's expense. (TAC ¶ 3; id. Ex. 3 ¶¶ 9, 10; id. Ex. 4 ¶¶ 9, 10.)

To help assure that borrowers obtained and maintained hazard insurance, BANA entered into an outsourcing agreement ("Outsourcing Agreement") with Defendant Newport Management Corp. ("Newport"). (Mot. at 6; Siegel Decl. Ex. 8 ("Outsourcing Agreement"), Doc. 273.) Newport is a wholly owned subsidiary of Defendant Balboa. (Mot. at 6.) Under the Outsourcing Agreement, Newport had access to and used BANA's electronic data system to track borrowers' hazard insurance. (Id.; Outsourcing Agreement; Wyatt Report at 4–5.) Where Newport's monitoring revealed no proof of a borrower's hazard insurance, Newport began to send a series of three letters to the borrower; these letters requested proof of hazard insurance and notified the borrower that BANA would force place insurance if no proof of hazard insurance was received (aka "cycle letters"). (Mot. at 7; Wyatt Report at 6–7.) If the borrower failed to provide proof of insurance after the second letter in the cycle, a third letter was sent to the borrower that stated that force-placed insurance had been obtained and retroactively placed on the property prior to the date of the third letter. (Siegel Decl. Ex. 3 ("Hunter Report") ¶ 12, Docs. 269–6–269–7.)

Defendants Balboa and Meritplan underwrote FPI for BANA once it was determined that borrowers did not have hazard insurance on their property. (Balboa Opp'n at 5.) This was done through master policies between BANA and Balboa or Meritplan that were obtained by Banc of America Insurance Services, Inc. ("BAISI").[2] (BANA Opp'n at 3–4.) Under the master policies, Meritplan or Balboa would bill BANA for the FPI premi-

---

1. Defendant BAC Home Loan Servicing, LP has now merged into BANA.

2. Balboa, Meritplan, and Newport were owned by Countrywide until July 2008 when BANA purchased Countrywide. (BANA Opp'n at 4.)

um; the FPI premiums charged to BANA were developed on a state-by-state basis and "were filed with each state's [Department of Insurance] and approved whenever required." (Balboa Opp'n at 7; Hunter Report ¶ 12.) BANA would then bill the borrower on whose property FPI was placed for the full amount of the premium charged by the Meritplan or Balboa. (Hunter Report ¶ 12; Siegel Decl. Ex. 4 ("Birnbaum Report") at 17, Doc. 273.) This is generally done by adding the amount of the premiums to an existing escrow account or, if there is no escrow account in place, by creating an escrow account. (Hunter Report ¶ 12; Birnbaum Report at 17.)

Many borrowers who are charged for FPI may either not pay for, or not pay the full rate of, FPI. (Loirot Decl. ¶¶ 15–17, Doc. 290.) If the borrower provides evidence that coverage never lapsed, then the FPI policy is cancelled and the borrower's escrow account is adjusted to show a full refund of the premium. (Hunter Report ¶ 13.) If the borrower's insurance lapsed for less than a full year, then a *pro-rata* portion of the premium is refunded to the borrower's escrow account. (*Id.*) The borrower may also elect to "opt out" of BANA's requirement that the borrower maintain hazard insurance coverage equal to replacement cost, in which case BANA cancels the FPI and credits the borrower's escrow account in full. (Loriot Decl. ¶ 17.) Further, in some cases, BANA advances the premiums but is never reimbursed by the borrower because the borrower is, for instance, delinquent on his or her payments or in foreclosure, or because the borrower has entered into a short sale, loan modification, forbearance agreement, or some other agreement with BANA that settles the borrower's claims with the bank. (*Id.* ¶ 18.)

Plaintiffs filed a Third Amended Complaint ("TAC") on August 28, 2012, which is the operative complaint in this case. (TAC.) On December 20, 2012, the Court granted in part and denied in part Defendants' motions to dismiss, leaving the following claims remaining in this action: (1) violation of Business and Professions Code § 17200 ("UCL"); (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; and (4) unjust enrichment. (Docs. 204, 205, & 207.) Plaintiffs Christopher Gustafson and Zahid Fraz now move to certify the following nationwide class:

> All persons who have or had a residential mortgage loan serviced by Bank of America, N.A. or BAC Home Loans Servicing, LP and, in connection therewith, were charged for "force-placed" hazard insurance coverage provided by Balboa Insurance Company and/or its subsidiaries on the secured property between June 16, 2007 and May 31, 2011.

(Mot. at 1.)

## II. CERTIFICATION UNDER RULE 23

### A. Nationwide Application of the UCL

■ "A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir.2001). California courts apply two different analyses for selecting which law should apply in an action. *Washington Mutual Bank, FA v. Super. Ct.*, 24 Cal.4th 906, 914–15, 103 Cal.Rptr.2d 320, 15 P.3d 1071 (2001). Where the parties have entered into a contract that specifies that another jurisdiction's law will govern their disputes, courts apply the framework set forth in *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (1992). *Id.* "Alternatively, when there is no advance agreement on applicable law, but the action involves the claims of residents from outside California, the trial court may analyze the governmental interests of various jurisdictions involved to select the most appropriate law." *Id.*; *see also Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 590–91 (9th Cir.2012) (applying governmental interest test where no contract governed the action between the parties). Because putative class members' mortgage contracts contain choice of law provisions, the Court will start with the analysis set forth in *Nedlloyd.*

### 1. *Nedlloyd* Analysis

■ Defendants contend that Plaintiffs cannot assert a nationwide UCL class because most of the putative class members'

mortgage contracts contain choice-of-law provisions dictating that the contracts are governed by federal law or the law of the state in which the mortgaged property is located. (BANA Opp'n at 23.)[3] Under *Nedlloyd*, a trial court "should first examine the choice-of-law clause and ascertain whether the advocate of the clause has met its burden of establishing that the various claims of putative class members fall within its scope."[4] *Washington Mutual*, 24 Cal.4th at 916, 103 Cal.Rptr.2d 320, 15 P.3d 1071.

"[A] valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationship it creates." *Nedlloyd*, 3 Cal.4th 459, 470, 11 Cal. Rptr.2d 330, 834 P.2d 1148 (1992). Here, the form contracts at issue specify that "[t]his Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the property is located." (Shinners Decl. Ex. 9 ("Gonzalez Decl.") Ex. A ¶ 14 ("FHA Mortgage–WY"), Doc. 297–3; Gonzalez Decl. Ex. B ¶ 16 ("OREGON–Single Family–Fannie Mae–Freddie Mac UNIFORM INSTRUMENT") (emphasis added)). Plaintiffs do not challenge the validity of this clause but rather argue that their UCL claims are "clearly extra-contractual causes of action" because they "do not arise from the mortgage agreements but rather concern

the unfair conduct pursued by Defendants under separate, wrongful collusive arrangements [among Defendants] with respect to [FPI] policies." (Reply at 16–17.)

The Court disagrees with Plaintiffs and finds that Defendants have met their burden in establishing that putative class members' UCL claims fall within the mortgage contracts' choice-of-law provisions. The crux of Plaintiffs' claim is that Defendants engaged in unfair business practices when they used their authority under a borrower's *mortgage contract* to force place insurance that included costs and fees unrelated to the provision of insurance. Indeed, Plaintiffs start their Statement of Facts as follows: "What is being challenged is Defendants' predatory practice of exploiting BANA's contractual authority to obtain force-placed hazard insurance to further impose unnecessary, inappropriate[,] and excessive charges on borrowers." (Mot. at 3.)[5] Plaintiffs' claims thus stem from contractual provisions that allows Defendants to force place insurance. Thus, the Court finds that Plaintiffs' UCL claims fall within the scope of the various choice-of-law provisions at issue. *See Estrella v. Freedom Fin. Network, LLC*, No. C 09–03156 SI, 2010 WL 2231790, at *4 (N.D.Cal. June 2, 2010) (finding that Plaintiffs' claims under the CRLA and UCL related to fees paid and services performed under a contract fell within the choice-of-law provision contained within that contract).

---

3. It appears that most, but not all, mortgage contracts entered into by putative class members contain choice-of-law provisions. Defendants state that the "vast majority of the putative class members, including those written on Fannie Mae/Freddie Mac and FHA forms, contain substantively identical choice-of-law provisions dictating that the contracts are subject to federal laws and the laws of the state in which the mortgage property is located." (BANA Opp'n at 23.) The parties provide no further information on which putative class members' mortgage contracts, if any, do not contain a choice of law provision or contain a different choice of law provision than the majority of putative class members.

4. "[T]he scope of a choice-of-law clause in a contract is a matter that ordinarily should be determined under the law designated therein."

*Washington Mut. Bank, FA*, 24 Cal.4th at 916 n. 3, 103 Cal.Rptr.2d 320, 15 P.3d 1071. In *Nedlloyd*, however, the court applied California law to determine the scope of a choice-of-law provision designating Hong Kong law as the governing law because "neither [party] requested judicial notice of Hong Kong law on the point nor supplied evidence of the relevant aspects of that law." *Id.* Here, neither party requested judicial notice nor supplied evidence of the laws designated in each mortgage contracts' choice-of-law provision. Thus, the Court will apply California law to determine the scope of the relevant choice-of-law provisions.

5. As discussed above, Plaintiffs have brought breach of contract and breach of the implied covenant of good faith and fair dealing claims based on this same conduct.

Once a court determines that a claim falls within the scope of a choice-of-law clause, it must consider whether the clause is enforceable. *Washington Mutual Bank*, 24 Cal.4th at 916, 103 Cal.Rptr.2d 320, 15 P.3d 1071. In assessing the enforceability of a choice-of-law provision, California courts follow the approach of section 187(2) of the Restatement (Second) of Conflict of Laws. *Id.* Under that approach, the proponent of the choice-of-law provision bears the burden of showing that the chosen state "has a substantial relationship to the parties or their transaction" or "there is any other reasonable basis for the parties' choice of law." *Id.* If either of these tests is met, the choice-of-law provision will be enforced "unless the other side can establish both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in the determination of the particular issue." *Id.* at 917, 103 Cal. Rptr.2d 320, 15 P.3d 1071.

Here, Defendants have met their burden under section 187. The chosen states in the choice-of-law provisions bear a substantial relationship to the contracting parties and to their transactions. The contracting parties chose the law of the state in which the property is located; because the property is the subject of the mortgage contract, the Restatements test is easily met. *See Lane v. Wells Fargo*, No C12–04026 WHA, 2013 WL 269133, at *4 (N.D.Cal. Jan. 24, 2013) (enforcing an Arkansas choice-of-law provision in mortgage contracts where the subject property was located in Arkansas and plaintiffs were residents of Arkansas). Plaintiffs do not appear to contest this element. Thus, the Court will enforce the choice-of-law provision unless Plaintiffs can show that that both (1) "the chosen law is contrary to a fundamental policy of California" *and* (2) "that California has a materially greater interest in the determination of the particular issue." *Washington Mut. Bank*, 24 Cal.4th at 917, 103 Cal.Rptr.2d 320, 15 P.3d 1071. Plaintiffs, however, have failed to make any showing that the laws designated in their respective choice-of-law provisions are contrary to a fundamental policy of California. Thus, the Court finds that the choice-of-law provisions contained in putative class members contracts are enforceable and would bar a claim under the UCL. *See Nat'l Seating & Mobility, Inc. v. Parry*, No. C 10–02782 JSW, 2012 WL 2911923, at *5 (N.D.Cal. July 16, 2012) (denying class certification of a UCL claim where choice-of-law provisions in the parties' contracts designated Tennessee law as the governing law).

### 2. *Mazza* and the Governmental Interest Test

Even if the choice-of-law provisions in putative class members' contracts were not controlling, certification of a nationwide UCL class fails under the governmental interest test and the teachings of *Mazza*. The Ninth Circuit's decision in *Mazza* sets forth the framework for applying California law to a nationwide class action consistent with (1) the Constitution and (2) California's choice of law rules. 666 F.3d at 589–90. The class action proponent bears the initial burden of demonstrating that California has "significant contact or significant aggregation of contacts" to the claims of each class member. *Id.* at 589 (internal citations omitted). Once a plaintiff has made this showing, the burden then shifts to the defendants "to demonstrate that foreign law, rather than California law, should apply to class claims." *Id.* at 590.

Here, Plaintiffs argue that California has significant contact or aggregation of contacts to the claims of each class member because "California functioned as the nerve center for Defendants' [FPI] activities." (Reply at 12.) First, Plaintiffs note that Balboa, Newport, and Meritplan are all headquartered in California. (*Id.* at 13; Trask Decl.App. A, Chart 4, Doc. 308–2.) Second, Plaintiffs claim that several "high-level individuals and executives involved with the development of Defendants' [FPI] practices were located in California[ ] and made decisions relating to the [FPI] at issue." (Reply at 13; Trask Decl.App. A Chart 1.) And finally, Plaintiffs argue that "[c]rucial contracts and agreements relating to [FPI] required the application of California law." (Reply at 13.)

Defendants, however, contend that California was not the nerve center of their FPI activities because (1) BANA, BAC Home

Loans Servicing (BANA's servicing arm), and BAISI were all headquartered in other states; (2) Newport's tracking operations on BANA's loans were located in Texas, Pennsylvania, and Arizona; and (3) decision-making related to FPI was "collaborative" and not limited to any one state. (Joint Surreply at 2.) Moreover, Defendants correctly note that many of the documents submitted by Plaintiffs in support of their position were entered into outside of the relevant time period or discuss issues that are not relevant to their claims. (*See, e.g.*, Trask Decl. Appx. A, Exs. 3K–3M (Agreements entered into on June 1, 2011, after the relevant class period), Doc. 310–4; *id.* Ex. 3D (explaining how tracking fees are charged per month), Doc. 310–2–310–3). Nonetheless, given that the application of the California's choice-of-law test militates against a nationwide UCL class under these facts, the Court need not decide whether Plaintiffs have met their constitutional burden.[6]

As the Court in *Mazza* stated, "California law may only be used on a class-wide basis if 'the interests of other states are not found to outweigh California's interest in having its law applied.'" 666 F.3d at 590. Thus, California courts apply a three-part governmental interest test to determine if other states' interests outweigh California's interest. *Id.*

First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.

Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.

Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

*Id.* (quoting *McCann v. Foster Wheeler LLC*, 48 Cal.4th 68, 81–82, 105 Cal.Rptr.3d 378, 225 P.3d 516 (2010)).

### a. Material Differences Among the States' Consumer Protection laws

In applying the first element of the governmental interest test, the Court concludes that there are material differences among the states' consumer protection laws. As documented by another Court in this jurisdiction, "at least seven states require a pre-filing notice to the defendant in order to file a claim, including Alabama, Georgia, Indiana, Massachusetts, Texas, and Wyoming." *Gianino v. Alacer Corp.*, 846 F.Supp.2d 1096, 1100–01 (C.D.Cal.2012); *see, e.g.*, Ala.Code § 8–19–10(e); Ga.Code Ann. § 10–1–399(b); Ind.Code Ann. § 24–5–0.5–5.[7] Moreover, statutes of limitations vary among the states from one to ten years, which, as discussed more below, means that many of the putative class members' claims would be barred. *See Gianino*, 846 F.Supp.2d at 1101 (documenting differences in statutes of limitations applicable to states' consumer protec-

---

6. In their briefs and at Oral Argument, Plaintiffs cited repeatedly to this Court's Preliminary Approval Order in *Kearney v. Hyundai Motor Am.*, No. SACV 09–1298–JSL (MLGx), ECF No. 91, in which the Court certified a nationwide UCL settlement class. There, Plaintiffs had established that California had "'significant contact or significant aggregation of contacts' to the claims of each class member" and Defendants had not argued that foreign law should apply. *Id.* at 539–40. Here, however, Defendants have fiercely contended that foreign law should apply and have offered reasons and evidence supporting their contention.

7. Plaintiffs argue that Defendants failed to meet their burden of showing there are material differences among the states' consumer protection laws because they merely "cit[ed] to other cases" and did not conduct a fifty state survey themselves. (Reply at 18.) Defendants could certainly have performed a more thorough analysis of the consumer protection laws as applied to this case. They did, however, note the various differences among the states' consumer protection laws and provide citations to cases that performed thorough analyses of these differences. (*See, e.g.*, BANA Opp'n at 25.) A review of these differences shows that they are, in fact, material to this case.

tion laws). Several states do not permit class actions under their consumer protection laws including Montana, South Carolina, Tennessee, Alabama, and Virginia. *Id.; see, e.g.,* Mont.Code Ann. § 30–14–133(1); S.C.Code Ann. § 39–5–140(a); Ala.Code § 8–19–10(f). Some states generally restrict class actions brought under their respective consumer protection laws to state residents, while at least one state does not recognize a private right of action. *Gianino,* 846 F.Supp.2d at 1101; *see, e.g., Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 187, 296 Ill.Dec. 448, 835 N.E.2d 801 (2005) (limited private right of action under the Consumer Fraud Act to circumstances where the disputed transaction occurred "primarily and substantially in Illinois"); *Molo Oil Co. v. River City Ford Truck Sales, Inc.,* 578 N.W.2d 222, 228 (1998) (no private cause of action under Iowa's consumer fraud statute). Finally, as recognized by the *Mazza* court, "there are also material differences in the remedies given by the state laws." 666 F.3d at 591. While Plaintiffs under the UCL can recover only restitution and injunctive relief, "[t]he remedies permitted by other states vary and may depend on the willfulness of the defendant's conduct." *Id.*

The Court finds these differences are not trivial as they go to putative class members' rights to bring consumer protection based claims. Moreover "[t]hey determine whether the relief will be generous, modest, or if there is any relief available at all." *Gianino,* 846 F.Supp.2d 1096. The Court must therefore address the second element of the governmental interest test.

### b. Foreign States' Interests In the Application of Their Laws

■ As the Ninth Circuit has recognized, "[e]very state has an interest in having its law applied to its resident claimants." *Mazza,* 666 F.3d at 591–92 (quoting *Zinser,* 253 F.3d at 1187). And "each state has an interest in setting the appropriate level of liability for companies conducting business within its territory." *Id.* at 592.

■ Here, foreign states' interests in applying their laws to putative class members' claims are squarely implicated. First, Plaintiffs' UCL claims arise from Defendants' practices in force-placing insurance under putative class members' respective mortgage contracts with Defendants. Many of these mortgage contracts were entered into in foreign states and govern property that is located within these foreign states' borders. (*See, e.g.,* TAC Ex. 3 ("Gustafson Mortgage") (entered into in Rock Island, Illinois; naming lender as American Bank and Trust Co., a corporation organized and existing under the laws of the State of Iowa; naming property in Silvis, Illinois).) Second, the premiums on which putative class members base their claims are, in many cases, filed and/or approved by foreign states. Though Plaintiffs argue that the filed rate doctrine[8] is not directly implicated, the fact remains that the premium rates filed and/or approved in these various states were passed on to borrowers in the exact amount approved. Thus, foreign states have an interest in the insurance premiums charged to customers within their borders.

Finally, while *some* of Defendants' practices related to FPI and *some* of the employees involved in developing those practices are located in California, the practices and procedures involved in FPI appear to be "collaborative." Plaintiffs do not deny that "insurance tracking and placement services were performed in Texas, Pennsylvania, and Arizona." (*See* Reply at 15 (quoting BANA Opp'n at 24).) Further, several of the Defendants are headquartered in foreign states: BANA is headquartered in Charlotte, North Carolina, BAISI's corporate headquarters is in Maryland, BAC Home Loans Servicing was a Texas limited partnership with its principal offices in Plano, Texas. (Shinners Decl. Ex. 7 ("Cherkezian Decl.") ¶¶ 50–54.) And many of BANA's employees involved in Defendants' FPI practices were located in other states, including Texas and North Carolina. (*See* Cherkezian Decl. ¶ 55; Shinners Decl. Ex. 32 ("Grzeskowiak Decl.") ¶¶ 5, 19 (noting that Newport had 225 employees

---

**8.** The filed rate doctrine, "bar[s] recovery by those who claim injury by virtue of having paid a filed rate." *Taffet v. Southern Co.,* 967 F.2d 1483, 1488 (11th Cir.) (*en banc*), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992).

working on BANA's account in Texas and an additional 100 employees working on the accounts in Pittsburgh, Pennsylvania, and Chandler, Arizona).) Foreign states therefore have an interest in regulating conduct that was carried out, in part, within their borders.

### c. Impairment of States' Interest

■■■ Having found that foreign states have an interest in applying their laws to putative class members' claims, the Court must now determine which states' interests would be most impaired if its laws were not applied. "California recognizes that 'with respect to regulating or affecting conduct within its borders, the place of the wrong has the predominant interest.'" *Mazza*, 666 F.3d at 593 (quoting *Hernandez v. Burger*, 102 Cal. App.3d 795, 802, 162 Cal.Rptr. 564 (1980)). Further, "California considers the 'place of the wrong' to be the state where the last event necessary to make the actor liable occurred." *Id.*

■■■ Here, the parties disagree on where the place of the wrong occurred. Defendants argue that the place of the wrong is where the charges occurred, which happened in each borrower's home state. (Defs.' Sur–Reply at 3.) Plaintiffs argue that the place of the wrong is California. (Reply at 19.) This is so because, according to Plaintiffs, putative class members' FPI came into effect immediately upon lapse of their voluntary insurance. (*Id.*) Balboa provided the FPI from its headquarters in Irvine, California, pursuant to master agreements calling for the application of California law. (*Id.*)

But Plaintiffs' own arguments and experts contradict their position. As Plaintiffs' expert, J. Robert Hunter, explains, after the insurance vendor issues an insurance binder to the borrower, the insurance vendor bills "the loan servicer for the premium." (Hunter Report ¶ 12.) "The loan servicer [then] bills each borrower that was force-placed the full amount of the premium charged by the insurer to the loan servicer for that borrowers' coverage, typically by adding the amount of the premium to an existing escrow or, if there is no escrow in place, by creating an escrow account." (*Id.*) Furthermore, Hunter states that "liability occurred at the time that Bank of America billed the borrower and collected (or asserted a right to future collection of) the passed-through premiums *via* the borrower's escrow." (Hunter Report ¶ 65.) Additionally, Plaintiffs have repeatedly argued that the rates charged to the loan servicer must be considered separate and apart from the charges passed on to the borrower; Plaintiffs cannot now argue that the issuance of the insurance binder to the loan servicer is "where the last event necessary to make the actor liable occurred." The Court agrees with Defendants that the last event necessary to make Defendants liable occurred where the insurance premiums were charged to borrowers, which occurred in their home states. (*See* Defs.' Sur–Reply at 3.) Accordingly, "[t]hese foreign states have strong interest in the application of their laws to transactions between their citizens and corporations doing business within their state." *Mazza*, 666 F.3d at 594.

Further, as in *Mazza*, California's interest in applying its laws to residents of foreign states is "attenuated." *Id.* California has an interest in "regulating those who do business within its state boundaries, and foreign companies located there...." *Id.* But foreign states' interests are more directly implicated by the facts of this case, and those interests would be most impaired if the respective foreign states' laws were not applied. Thus, a nationwide class may not be certified under the UCL on the facts of this case.

### B. Legal Standard for Class Actions under Rule 23

■■■ As the Supreme Court recently reaffirmed, "[t]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011). "To obtain class certification, a class plaintiff has the burden of showing that the requirements of Rule 23(a) are met and that the class is maintainable pursuant to Rule 23(b)." *Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1266 (9th Cir.2010). "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class

whose claims they wish to litigate." *Dukes,* 131 S.Ct. at 2550. Under Rule 23(a), the party seeking certification must demonstrate:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). "Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Dukes,* 131 S.Ct. at 2548. Here, Plaintiffs seek certification of the class under Rule 23(b)(3), which permits maintenance of a class action if

the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed.R.Civ.P. 23(b)(3).

▇ "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes,* 131 S.Ct. at 2551. This requires a district court to conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." *Id.*

### C. The Class Does not Meet Rule 23 Requirements

Plaintiffs are unable to meet the commonality or predominance requirement of Rule 23(a) and (b)(3), respectively, for any one of their remaining three claims. As a result, the Court need not address the other requirements of Rule 23(a) and (b)(3).

▇ "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes,* 131 S.Ct. at 2551 (internal quotation marks and citation omitted). "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir.1998). The plaintiff must allege that the class's injuries "depend upon a common contention" that is "capable of classwide resolution." *Dukes,* 131 S.Ct. at 2551. In other words, the "determination of [the common contention's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "What matters to class certification ... is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (internal quotation marks and citation omitted).

▇ "[I]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend,* —— U.S. ——, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). "The predominance analysis under Rule 23(b)(3) focuses on the relationship between the common and individual issues in the case and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wang v. Chinese Daily News, Inc.,* 737 F.3d 538, 545, 2013 WL 4712728, at *5 (9th Cir.2013) (citation and internal quotation marks omitted). In other words, "[t]he main concern of the predominance inquiry under Rule 23(b)(3) is the balance between individual and common issues." *Id.* (citation and internal quotation marks omitted).

Here, Plaintiffs enumerate a number of questions that they believe are common to all class members. These include (1) whether "Defendants exploit[ed] the [FPI] process by including items not related to the provision of FPI in the charges imposed on borrowers"; (2) "[w]hether BANA earned the commission payments from Balboa"; (3) "[w]hether it was proper to include commissions, earned or unearned, in the FPI charges to borrowers";

and (4) "[w]hether it was appropriate to charge borrowers for tracking services." (Mot. at 14–15.) They argue that common proof will "overwhelmingly predominate this case" because of the following:

> (1) the mortgage terms relating to the force-placement of insurance are substantially uniform among borrowers; (2) the mechanism for force-placing insurance is standardized and not dependent on issues related to individual borrowers; (3) the charges assessed to borrowers who are force-placed by BANA are based on uniform metrics and are the same as those premiums charged by Balboa to BANA; (4) Defendants' decision to integrate items unrelated to the provision of [FPI], including but not limited to commissions, below-cost tracking, and excessive profits, into the charge of FPI was uniformly applied across force-placed borrowers; and (5) injury can be quantified class-wide.

(Mot. at 20.)

But, while Plaintiffs may abstractly list a number of questions and facts that are "common" to putative class members, they fail to show how these facts and questions meet the commonality or predominance requirements in the context of their claims. The Court will address each of these claims below.

### 1. Breach of Contract Claim

■ Turning first to Plaintiffs' breach of contract claim, the Court finds that Plaintiffs have failed to meet the commonality and predominance requirements of Rule 23. Plaintiffs' breach of contract claim hinges on a provision that "limits BANA's [FPI] conduct ... to that which is 'reasonable' and/or 'necessary' to protect Lender's interest in the property." (Reply at 26.) Plaintiffs claim

that the putative class members' mortgage contracts almost uniformly contain this provision.

But the mortgage contracts at issue here contain numerous material variations of the provision that serves as the basis for Plaintiffs' breach of contract claim. Though neither side gives a precise number of the various mortgage contracts and templates in the relevant portfolios, BANA notes that there are conforming loan mortgage contracts, non-conforming loan mortgage contracts, and template forms used by over 3,000 lenders from whom Bank of America has purchased loans. (BANA Opp'n at 28–29.) The sheer number of form contracts at issue here counsels against certification.[9] *Cf. Westways World Travel Inc. v. AMR Corp.*, No. EDCV 99–386, 2005 WL 6523266, at *9–10 (C.D.Cal. Feb. 24, 2005) ("The sheer number of additional agreements, even though many are form contracts, suggests that individualized issues would predominate this case."), *aff'd*, 265 Fed.Appx. 472, 476 (9th Cir.2008). After reviewing "relevant portions" of some 2,627 mortgage templates used by Defendants during the class period, Plaintiffs' expert[10] concluded the following: (1) "Nearly half [of the mortgage contract excerpts] stated that the servicer can take 'reasonable or appropriate' action" in the event the borrower failed to maintain hazard insurance; (2) over half of the excerpts "track[ed] language giving the servicer the right to do what is 'necessary' "; (3) less than 1% of the excerpts state that the servicer could take "reasonable" action; and (4) "[l]ess than 1% [of the excerpts] state the servicer can take 'reasonably necessary' action." (Trask Decl. Ex. 5 ("Wyatt Rebuttal") ¶ C(1)(g), Doc. 308–7.) While Plaintiffs ap-

---

**9.** At oral argument, Plaintiffs' counsel contended for the first time that there were twelve groupings of templates at issue. It is unclear if Plaintiffs are arguing that they arrived at this number from an examination of their expert's report, especially since the report only appears to arrive at nine or ten variations. (*See* Wyatt Rebuttal Report.) At any rate, a review of Plaintiffs' expert's report shows material variations, as noted below, that Plaintiffs did not adequately address.

**10.** Plaintiffs' expert offers the opinion that mortgage contracts are standardized in their treatment of FPI rights and obligations. (Wyatt Report § I.B.) Plaintiffs' expert initially based his

conclusions on his 20 years of experience in the mortgage industry and a review of about 13 mortgage contracts. (Shinners Decl. Ex. 27 ("Wyatt Depo.") at 133:3–8.) After Defendants attacked Plaintiffs' expert's conclusions based on his failure to review non-conforming mortgage contracts or the template forms used by over 3,000 lenders from whom Bank of America had purchased loans (BANA Opp'n at 29), Plaintiffs' expert reviewed a spreadsheet containing mortgage clauses that dealt directly with FPI placement from 2,627 mortgage templates. (Wyatt Rebuttal Report.)

pear to contend that "reasonable" and "necessary," and the various combinations of those words used here, mean the same thing, they offer little to no support for this proposition.

Further, contrary to Plaintiffs' assertion, these words or phrases are not properly read in isolation. Here, many of the mortgage contracts contain additional language such as parentheticals that define the "reasonable" or "necessary" term used therein. For example, one form from DocMagic states that if borrowers fail to perform their obligations under the contract the "Bank may, at Bank's option, take any action reasonably necessary (including, without limitation, paying expenses and attorneys' fees). . . ." (Wyatt Rebuttal Report Ex. 1 ("Spreadsheet") at 5 [11].) Another form template from Wolters Klewers Financial Services provides that, if borrowers fail to perform their obligations under the contract, the "Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2." (*Id.* at 6.)

Moreover, these clauses are not the only clauses at issue. As Plaintiff's expert notes, the mortgage agreements also contain clauses discussing FPI. (Wyatt Rebuttal Report ¶ C(1)(f).) Plaintiff's expert identified at least five variations in the language related to FPI, with half of the agreements stating only that the "borrower was obligated to maintain hazard insurance" and the remaining instruments containing variations of "language which combined the borrower's obligation to maintain hazard insurance with information about [FPI]." (*Id.*) The contracts that provide information about FPI, howev-

er, are materially different from those that do not; for instance, agreements containing information about FPI often state that FPI may provide less protection than other insurance and that cost of FPI may be significantly higher than the insurance the borrower previously obtained. (*See* Wyatt Rebuttal Report Ex. 1.)

Furthermore, Plaintiff's expert did not even review the entirety of the form mortgage contracts at issue here, as he reviewed only excerpts provided to him by Plaintiffs' counsel. (Wyatt Rebuttal ¶ C(1)(c).) [12] Many of the provisions Plaintiff's expert discusses reference other sections of the agreement. (Wyatt Rebuttal Report ¶ C(f)(ii)(3)-(4) (less than 1% of the agreements allow the Lender to force place insurance and charge the borrower in "accordance with Section 9 below" while approximately 4% of the agreements contain varying language allowing the lender to obtain coverage to protect its rights in the property "in accordance with Paragraph 7").) [13] Thus, the Court finds Plaintiff's expert's opinion—that the contracts used in the mortgage industry are standardized—unpersuasive in this instance; the variety and great number of form contracts at issue here would alone preclude class certification. *See Gordon v. Chase Home Fin., LLC,* No. 8:11–cv–2001–T–33EAJ, 2013 WL 436445, at *5 (M.D.Fl. Feb. 5, 2013) (denying class certification in an FPI case on a breach of contract claim where mortgage contracts contained differing language); *Cf. Lane v. Wells Fargo Bank, N.A.,* No. C–12–04026 WHA, 2013 WL 3187410, at *4–5 (N.D.Cal. June 21, 2013) (allowing certification of a California-only class on a breach of contract claim involving FPI but limiting the class definition to persons who had an FHA mortgage) [14]

11. Plaintiff did not number the pages in the Spreadsheet. The Court assumes that the first sheet of the Spreadsheet is "page one" and all pages after that follow in numerical order.

12. Plaintiff's expert states that the "relevant portions" of these agreements are "those clauses that deal directly with the borrower's obligation to maintain hazard insurance and the servicer's right to force[ ] place insurance." (Wyatt Rebuttal Report ¶ C n. 1) But Plaintiff's expert is not an expert in the law and is not qualified to determine what may be relevant from a legal standpoint.

13. These provisions may be referring to the paragraphs discussed above, which generally provide more information on the lenders rights and obligations. But Plaintiffs have not made the relationship among these provisions clear. And the Court was not provided with the mortgage templates at issue, so it is unable to place these provisions in context.

14. Defendants also contend that the "reasonable" and/or "necessary" language is not contained in the sections dealing with FPI but is in a separate section several paragraphs below. Thus, the Court would also have to evaluate the

Moreover, Plaintiffs seek to certify a *nationwide* class based on breaches of these varying contracts. "Where the applicable law derives from the law of the 50 states, as opposed to a unitary federal cause of action, differences in state law will compound the disparities among class members from the different states." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir.2001) (internal alterations, quotation marks, and citation omitted). Here, there are key differences among states laws regarding, for instance, the admissibility of extrinsic evidence. (BANA Opp'n at 21); *see also Duchardt v. Midland Nat'l Life Ins. Co.*, 265 F.R.D. 436 (S.D.Iowa 2009) (noting that "the law of 47 states ... vary as to their rules governing contract interpretation, especially regarding the use of extrinsic evidence in contract interpretation...."). For instance, the Ninth Circuit has noted that "[i]n contrast to many other states, California has a liberal parol evidence rule: It permits consideration of extrinsic evidence to explain the meaning of the terms of a contract even when the meaning appears unambiguous." *Food Consulting Grp. Inc. v. Azzalino*, 270 F.3d 821, 826 (9th Cir.2001). Other states, such as Arkansas, allow extrinsic evidence only where there is contractual ambiguity. *See, e.g., Isbell v. Ed Ball Const. Co., Inc.*, 310 Ark. 81, 85, 833 S.W.2d 370 (1992) ("Only when ambiguity exists and the meaning of a contract becomes a question of fact is parol evidence admissible.")

Plaintiffs' only response to this argument is a conclusory statement that no extrinsic evidence is needed to interpret the terms reasonable and necessary because they are "plain English words." (Reply at 26.) But Plaintiffs fail to cite any legal authority for this proposition or propose a plan to manage differences among states' laws regarding the use of extrinsic evidence.[15]

The Court finds that the differences among states' breach of contract laws are material in this instance as they could greatly affect how the relevant provisions of the agreements are interpreted and ultimately whether there was a breach of those provisions.[16] *Cf. Jim Ball Pontiac–Buick–GMC, Inc. v. DHL Exp. (USA), Inc.*, No. 08–CV–761C, 2011 WL 815209, at \*7 (W.D.N.Y. March 2, 2011) ("[C]ourts have found class certification improper due to significant variations in the states' laws with regard to the use of extrinsic evidence"; denying class certification of a nationwide class on a breach of contract claim where contract interpretation was required); *Bowers v. Jefferson Pilot Fin. Ins. Co.*, 219 F.R.D. 578, 583 (E.D.Mich.

various forms of the "reasonable" and/or "necessary" language in conjunction with the provisions on FPI. Even a quick look at those provisions (as displayed in Plaintiffs' chart attached as Exhibit 1 to the Wyatt Rebuttal Report) shows that the various contracts used different language to describe the borrower's and lender's rights and obligations related to FPI.

**15.** Plaintiff also appears to make the argument that extrinsic evidence is unnecessary to interpret standardized consumer contracts. This position has been rejected by several courts, and thus, at least in interpreting some of the putative class members' contracts, the Court would likely need to look to extrinsic evidence. *See, e.g., Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1030 (8th Cir.2010) (denying class certification of breach of contract claim involving standardized annuity contracts because the court would need to resort to extrinsic evidence to interpret the contract); *Schnall v. AT & T Wireless Servs., Inc.*, 171 Wash.2d 260, 274, 259 P.3d 129 (2011) (rejecting contention that courts do not need to look to extrinsic evidence to interpret standardized consumer contracts).

**16.** At oral argument, Plaintiffs argued that Defendants did not treat borrowers differently in force-placing insurance based on the borrower's contracts and that therefore Defendants must believe all of the terms in the contracts are materially the same. First, Plaintiffs' only evidence that Defendants treated all borrowers the same is the fact that Defendants force placed insurance on borrowers' homes when their voluntary insurance lapsed; though Plaintiffs argue that Defendants included costs unrelated to the provision of FPI in all borrower's FPI charges, the evidence shows that the exact charges and the components of those charges varied by state and time period. . Second, even if Defendants had engaged in a common course of conduct with all borrowers, this does not change the material differences among the contract provisions on which Plaintiffs' rely. *See Sacred Heart Sys. Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1176 (11th Cir.2010) ("But by focusing solely on the defendant's course of conduct, the district court overlooked the substantial variation in the contracts and the corresponding rights and duties they provide the plaintiffs.")

2004) (denying class certification of a breach of contract claim where the contract would require interpretation because there was "significant variation in the laws of the states with respect to the use of extrinsic evidence"); *Ex parte Green Tree Fin. Corp.,* 723 So.2d 6, 10 (Ala.1998) (applying Alabama law and denying class certification in an FPI case where the court would have to "apply differing laws of the various states" to determine how much insurance was allowable under the mortgage contracts).

Further, assuming, *arguendo,* that the filed rate doctrine is not directly applicable, the Court would still need to look at the filed rates in each jurisdiction and the components of those filed rates to determine what charges were reasonable and/or appropriate, etc. Plaintiffs complain primarily about four "unreasonable" expenses in FPI rates: (1) insurance tracking expenses; (2) expenses for activities unrelated to the provision of FPI, such as loss draft or escrow administration; (3) FPI commissions to servicer-affiliated insurance agents; and (4) affiliate transactions at above-market prices. (Birnbaum Report at 24.) But not all Plaintiffs were charged for commissions. (*See* Shinners Decl. Ex. 6 ("Pellerin Decl.") ¶ 17 ("BAISI does not currently and has never received commissions on hazard insurance policies lender-placed on so-called 'Legacy Countrywide' loans."), Doc. 280–7; Birnbaum Report at 21 ("Following Bank of America's acquisition of Balboa, from January 2010 through June 2011, Balboa ceased paying a commission to BAISI . . . .").) And to determine the reasonableness and/or appropriateness, etc., of the other expenses, the Court would need to determine what expenses were actually passed on to borrowers and the amount of those expenses. This would require the Court to evaluate the filed rates of various jurisdictions because that was the exact rate passed on to borrowers. And, as Plaintiffs' expert, Birnbaum, admitted, what can be included in a rate can vary by state because "[s]ome states do have limitations on what

can go into a rate." (Quattrone Decl. Ex. Q2 ("Birnbaum Depo.") 42:8–43:1, Doc. 296–5.)

Moreover, not only did the rates at issue here vary by state, but they varied within states and changed over the class period. (*Id.* 37:1–38:13.) From 2007 to approximately November 2009, Defendants used an FPI program known as the Risk Based Program for the legacy Countrywide loans "which adjusted the applicable base rate in the state by ten individual factors including property type, location of the property in the state, occupancy status, age of the home, loan to value ratio, and square footage" ("Risk Based Program"). (Balboa Opp'n at 6; Dickinson Decl. ¶ 6, Doc. 293.) The legacy BANA portfolio, on the other hand, used an FPI program known as the Lender Placed Program ("LPP"), which did not consider individual factors. (Dickinson Decl. ¶ 7.) Thus, in 2007, Defendants filed different rates for the LPP and Risk Based Programs in each state. (*See id.*) In 2010, when the legacy Countrywide and the legacy Bank of America portfolios were unified, Defendants filed a series of new Risk Based Program rates in each state. (Dickinson Decl. ¶¶ 9–10; Quattrone Decl. Ex. Q10.) Thus, there were well over 120 base rates during the class period. (Dickinson Decl. ¶¶ 9–10.) These rates were then sometimes adjusted by scheduled rating factors, "which take[ ] into account attributes of the mortgage servicer and its portfolio." (Dickinson Decl. ¶ 15.) "Scheduled rating adjustments changed over time and also varied in terms of structure and application by state." (*Id.* at ¶ 16.) Thus, even if improper charges were included in the base rates, these charges may have been removed from the premiums charged to BANA and passed through to borrowers through the scheduled rating factors. (Balboa Opp'n at 8; Quattrone Decl. Ex. Q3 ("Hunter Depo.") 184:2–184:15, Doc. 296–6.) [17]

Additionally, the tracking fees paid by BANA to Newport also varied throughout the Class Period. (Balboa Opp'n at 6–7.) [18]

---

17. Birnbaum expressed the opinion that it is unlikely that certain costs were taken out through scheduled rating factors; yet he also stated that he was not sure, one way or another, if scheduled rating factors had been used to

reduce the allegedly improper charges passed on to borrowers here. (Birnbaum Depo. 80:12–21.)

18. Different outsourcing agreements also governed the tracking services provided to BANA.

Plaintiffs complain that BANA underpaid tracking fees to Newport and then passed the remaining tracking costs on to borrowers through FPI premiums. Between June 16, 2007, and December 2009, BANA paid Newport two cents per loan per month for all insurance tracking and hazard outsourcing services for the legacy Bank of America portfolio. (Quattrone Decl. Ex. Q4 ("Peterson Depo. Q4") 33:23–34:17, Doc. 295; Birnbaum Report at 4.) When the legacy Countrywide and legacy Bank of America loans were unified in late 2009, BANA paid Newport 15 cents per loan per month for tracking services. (Peterson Depo. Q4 46:12–20.) Plaintiffs claim that this amount still did not sufficiently cover the tracking costs,[19] and that Defendants did not reduce FPI premiums charged to borrowers from the higher tracking fees. (Birnbaum Report at 4.) Plaintiffs assert that these differences are irrelevant because Defendants' "business records reflect that analysis of the revenues from commissions, tracking fees and insurer profits were conducted by Defendants themselves on a nationwide basis." (Reply at 6 (citing to Trask Decl. Ex. 9).) But, again, Plaintiffs are challenging the reasonableness and/or necessity and/or appropriateness of costs incorporated into FPI premiums; thus, for purposes of their case, it matters what costs and expenses were loaded into those premiums, as for instance, fees for tracking services might be found more reasonable than commissions, or tracking fees in the amount of two cents may be found more reasonable or appropriate than tracking fees in the amount of ten cents.

Furthermore, there are also numerous variations among states' laws regarding several of the defenses that may apply here. For instance, this Court has previously found that several of the claims brought by Jason Aiello, one of the named Plaintiffs in the TAC, were barred by the statute of limitations.[20] The applicable statute of limitations, as well as states' rules regarding equitable tolling, application of the discovery rule, and other related principles, varies greatly.[21] Only statutes of limitations of fewer than four years are relevant here[22]; but even these statutes of limitations are governed by different rules. For instance, South Carolina, which has a three year statute of limitations, applies the discovery rule. *Maher v. Tietex Corp.*, 331 S.C. 371, 376–77, 500 S.E.2d 204 (1998). But in Delaware, which also has a three year statute of limitations, a cause of action accrues at the time of the breach. *Insurance Co. of N.A. v. NVF Co.*, No. C.A. 99C–01–036, 2000 WL 305338, at *2 (Del.Super.Ct. Jan. 20, 2000). While the Ninth Circuit held in *Cameron v. E.M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir.1976) that "the presence of individual issues of compliance with the statute of limitations [ ] does not defeat the predominance of the common questions," the case before it involved one state's statute of limitations (Oregon's). Here, the Court is faced with applying different statutes of limitations using different states' rules to a variety of individual circumstances.[23] These differences, *coupled* with the lack of common questions in other areas

(*Compare* Grzeskowiak Decl. ("Grz. Decl.") Ex. G1, Doc. 294 (General Services Agreement between Newport and BANA governing period from July 1, 2005 to September 30, 2008), *with* Grz. Decl. Ex. G7–G10, Docs. 294–294–1 (Insurance Services and Outsourcing Agreement between Countrywide and Newport and subsequent amendments to the Agreement)).

19. Plaintiffs do not give an estimate of the costs of tracking services, but one of their experts, Hunter, believed that 15 cents per loan was close to sufficient to cover the costs of tracking. (Hunter Depo. 188:4–13.)

20. The Court did not rule on Aiello's breach of contract claim because it was not before the Court; Aiello subsequently voluntarily dismissed his case against Defendants.

21. BANA provided the Court with a chart noting some of the differences in states' laws regarding the statute of limitations. For instance, several states have a three year statute of limitations. *See, e.g.*, Del.Code Ann. Tit. 10 § 8106; S.C.Code Ann. § 15–3–530(1).

22. The proposed class dates back only four years prior to the filing of the complaint.

23. For instance, Plaintiff Gustafson admits that he received the FPI notices but did not do anything about it (Gustafson Depo. 93:13–19; 138:5–139:5), while Plaintiff Fraz never made such an admission.

counsels against class certification of Plaintiffs' breach of contract claim. *See Contos v. Wells Fargo Escrow Co., LLC*, No. C08–838Z, 2010 WL 2679886, at *7 (W.D.Wash. July 1, 2010).

## 2. Breach of the Implied Covenant of Good Faith and Fair Dealing

■ For similar reasons, the Court finds that the commonality and predominance requirements are not met on Plaintiffs' breach of the implied covenant of good faith and fair dealing claim ("breach of the implied covenant claim"). Plaintiffs argue that there are only a few discrete differences among states' laws regarding breach of the implied covenant. (Reply at 28–29.) Plaintiffs argue that the elements of a breach of the implied covenant claim are uniform across the states except for the following: (1) Alabama and Louisiana require the breach of an express contract term; (2) Michigan limits breach of implied covenant claims to situations where a defendant exercised discretion afforded by a contract in bad faith; and (3) several states don't allow a claim for breach of the implied covenant in these circumstances. (*See* Trask Decl. Ex. 17 at 6–7, Doc. 308–14.)

Plaintiffs, however, neglect to properly address differences in other states' laws. For instance, Plaintiffs neglect to note that Florida law also requires a breach of an express term of the contract. *See Ins. Concepts and Design, Inc. v. Healthplan Servs. Inc.*, 785 So.2d 1232, 1234 (Fla.Dist.Ct.App.2001) ("[A] claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached.") Several states also appear to require a special relationship between the parties to support a breach of the implied covenant claim. *See Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 441 (Tex.Ct.App. 1998) (noting that, under Texas law, the nature of the relationship between the parties governs whether there is an implied duty of good faith and fair dealing); *Ins. Co. of the West v. Gibson Tile Co., Inc.*, 122 Nev. 455, 461, 134 P.3d 698 (2006) ("Although every contract contains an implied covenant of good faith and fair dealing, an action in tort for breach of the covenant arises only 'in rare and exceptional cases' when there is a special relationship between the victim and tortfeasor.")

And further still, Plaintiffs failed to address state law differences on whether intent is an element of a breach of the implied covenant claim, and, if so, what intent must be proven. *Yarger v. ING Bank, fsb*, 285 F.R.D. 308, 325 (D.Del.2012) (denying class certification where law of sixteen states varied regarding intent requirement). *Compare Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 251, 773 A.2d 1121 (2001) (requiring bad motive or intention to hold a party liable for breach of the implied covenant where that party was vested with discretionary decision making) *with Vila & Son Landscaping Corp. v. Posen Const., Inc.*, 99 So.3d 563, 567 (Fla. Dist.Ct.App.2012) (noting that a breach of the implied covenant claim does not require subjective bad faith). Plaintiffs merely dismiss these differences as insignificant, by, for instance, arguing that "Defendants cannot reasonably dispute that it [sic] intended to take the actions here at issue." (Trask Decl. Ex. 17 ("Suggested Trial Plan") at 7, Doc. 308–14.) Plaintiffs also suggest that a special verdict form can address some of these differences, but Plaintiffs' proposed special verdict form does not address differing intent requirements or differences in the types of relationships that can give rise to a breach of the implied covenant claim. (*Id.* at 5.)

Moreover, in most cases, the Court would need to look to the express terms of the contract to determine if there was a breach of the implied covenant. *See Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal.4th 342, 373, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992) ("It is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract.") Determining what conduct is allowed by the express terms, and, whether an express term has been breached in some states, would require the application of different states' laws to nearly 3,000 mortgage templates with differing applicable provisions. The Court concludes that this level of analysis defeats commonality and predominance. This conclusion is in line with several other courts

that have denied class certification on a breach of the implied covenant claim in FPI cases.[24] *Lane v. Wells Fargo Bank, N.A.*, No. C 12–4026 WHA, 2013 WL 3187410, at *4 (N.D.Cal. June 21, 2013) (denying class certification of a nationwide class in an FPI case where plaintiffs had failed to demonstrate commonality of state substantive law on breach of implied covenant claim); *Gordon*, 2013 WL 436445, at *8–9 (denying class certification on a breach of the implied covenant claim in an FPI case where relevant contract terms differed); *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9:11–cv–81373–DMM, 2013 WL 139913, at *9–10 (S.D.Fla. Jan. 10, 2013) (denying class certification of a Florida class on a breach of the implied covenant claim because, under Florida law, the court found that it would "need to examine the state of mind of each borrower, including awareness, expectations, and conduct").[25]

### 3. Unjust Enrichment

■ The Court further finds that variances in state law and individual fact issues defeat commonality and predominance on Plaintiffs' claim for unjust enrichment. Plaintiffs note that all fifty states "share a common core of elements for unjust enrichment" as they all require that (1) the plaintiff conferred a benefit on the defendant; (2) defendant accepted or retained the benefit; and (3) it would be unjust to allow the defendant to keep the benefit. (Suggested Trial Plan at 7.) According to Plaintiffs' chart documenting state law differences on unjust enrichment claims, in addition to these elements, twenty states further require that the defendant had an appreciation/knowledge of the benefit, nine states require that plaintiff have no adequate remedy at law, four states require that defendant's engaged in wrongful conduct, and five states require that defendants have an appreciation/knowledge of the benefit and that plaintiff have no adequate remedy at law. (Siegel Decl. Ex. 19.)

Defendants also note that there are differences among the states regarding the degree of wrongful conduct required for liability and whether a benefit must be directly conferred. For instance, Arkansas does not require any bad faith or wrongful conduct while Alabama law requires the defendant to have engaged in unconscionable conduct. *Compare Smith v. Whitener*, 42 Ark.App. 225, 228, 856 S.W.2d 328 (1993) (en banc) *with Wyeth, Inc. v. Blue Cross and Blue Shield of Alabama*, 42 So.3d 1216, 1225 (Ala.2010) (noting that Alabama courts require defendants to have engaged in unconscionable conduct for a claim of unjust enrichment). Several states also require the benefit to be directly conferred while other states allow recovery where the benefit was indirectly conferred. *Compare Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir.2012) (affirming dismissal of unjust enrichment claim under Florida law where benefit was indirect) *with State Dept. of Human Servs. ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 155 (Iowa 2001) (allowing recovery where benefit is indirect). Thus, there are a number of material differences among the states' laws on unjust enrichment. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 591 (9th Cir. 2012) (noting in a choice of law analysis that "[t]he elements necessary to establish a claim for unjust enrichment also vary materially from state to state"); *Kunzelmann*, 2013 WL 139913, at *10 (documenting differences among states' laws for unjust enrichment

24. Plaintiffs cite to two cases for the proposition that "numerous courts have certified multistate claims for class treatment." (Reply at 29.) But these cases are unavailing. First, *In re Checking Account Overdraft Litig.*, 281 F.R.D. 667, 682 (S.D.Fl.2012), dealt with the law of fifteen states on the plaintiffs' breach of the implied covenant claim; here, the Court would have to manage the law of 50 states. Second, the other case cited by Plaintiffs, *Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 346 (3d Cir. 1998), affirmed the final approval of a class action settlement; the Third Circuit has since noted that "state law variations are largely 'irrelevant to certification of a settlement class.'" *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 304 (3d Cir.2011) (internal citation omitted).

25. The court in *Lane* noted that "[W]here the laws of fifty states must be scrutinized for, at a minimum, two sets of contracts, 'variations in state law ... swamp any common issues and defeat predominance.'" 2013 WL 3187410, at *4 (alterations in original and citation omitted). Here, not only must the Court apply the law of fifty states, but, as noted, there are nearly 3,000 mortgage templates at issue.

claims and declining to certify a nationwide FPI class on that basis); *Thompson v. Jiffy Lube Intern., Inc.,* 250 F.R.D. 607, 626 (D.Kan.2008) (discussing variations on states' unjust enrichment laws and noting that "[b]ecause of such variations, federal courts have generally refused to certify a nationwide class based upon a theory of unjust enrichment").

These differences among states' laws are compounded by the necessity for individualized fact determinations. As discussed above, many borrowers who are charged for FPI may either not pay for, or not pay the full rate of, FPI. (Shinners Decl. Ex. 5 ("Loirot Decl.") ¶¶ 15–17.) Thus, if class members did not pay for FPI, then no benefit was conferred upon Defendants. Further, as noted above, different rates were filed in each state which incorporated different charges. (Quattrone Decl. Ex. Q2 ("Birnbaum Depo.") 37:1–38:13.) For instance, some class members were charged for commissions paid to Defendants, while others were not. (*See* Shinners Decl. Ex. 6 ("Pellerin Decl.") ¶ 17; Birnbaum Report at 21.) Again, while Plaintiffs try to aggregate all alleged improper fees, some types of fees may not meet the unjust enrichment requirements.

Moreover, individual class members' circumstances could preclude or reduce recovery in some instances. Some class members may admit that they received and read the cycle letters prior to the force placement of insurance, which warned the borrower that FPI could include commissions to BANA affiliates and gave borrowers a chance to purchase their own insurance; other class members may not have received and/or read these letters. (*See* Quattrone Decl. Ex. 15 ("Gustafson Depo.") 88:23–90:4, 91:20–92:1 (admitting that he probably opened the letters and gave them to family members for assistance).) Whether a plaintiff knowingly paid for FPI could affect their ability to recover under an unjust enrichment theory. *See Kunzelmann,* 2013 WL 139913, at *4 (recog-

nizing that named plaintiff's "knowledge, awareness, and voluntary payment" could be used as a defense in an FPI case); *Spagnola v. Chubb Corp.,* 264 F.R.D. 76, 99 (S.D.N.Y. 2010) (denying class certification in part because the Court would have to determine "for each individual class member, whether they knew or should have known of the circumstances surrounding the increases in their respective coverage but continued to pay, or whether such payment was the result of a mistake of fact or law relating to their obligation to pay").

Further, many of the Plaintiffs in this case may have received a benefit from FPI, such that it would not be unjust for Defendants to retain any benefit they received. *See Vertex, Inc. v. City of Waterbury,* 278 Conn. 557, 574, 898 A.2d 178 (2006) ("An implied in law contract may arise due to one party being unjustly enriched to the *detriment* of the other party.... Accordingly, an implied in law contract is another name for a claim for unjust enrichment." (internal citation omitted)); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 160, 137 Ill.Dec. 19, 545 N.E.2d 672 (1989) ("To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's *detriment* ...."). Borrowers may have paid less in FPI coverage than they would have for other coverage due to individual risk factors. (Quattrone Decl. Ex. 1 ("Appel Report") at 15–28, Doc. 296–4.) Indeed, there is evidence that Gustafson paid less for FPI than he would have paid to obtain other coverage. (*Id.* ¶ 49.) Courts facing similar circumstances have denied class certification because of the need for such individualized determinations. *See Kunzelmann,* 2013 WL 139913 (denying class certification of an unjust enrichment claim in an FPI case and noting that "because of the fact-specific nature of the inquiry required, an unjust enrichment claim is almost always-and certainly here-not suitable for class action treatment")[26]; *see also Vega*

---

26. The *Kunzelmann* court noted that, under Florida law, "a claim for unjust enrichment or a claim based on a breach of the implied covenant of good faith and fair dealing requires examina-

tion of the particular circumstances of an individual case as well as the expectations of the parties to determine whether an inequity would result or whether their reasonable expectations

*v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1274–75 (denying class certification on an unjust enrichment claim where class members had different degrees of understanding about Defendants' sales commission policy).

## III. CONCLUSION

For the reasons discussed above, the Court DENIES Plaintiffs' Motion. In light of this ruling, the Court need not reach Defendants' Motion to Strike ("MTS") portions of Plaintiffs' reply brief and supporting documents, (Doc. 309), as the MTS is not pertinent to the Court's ruling.

were met." *Id.* (citing *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir.2009)). The court noted that there were many differences among class members, including whether class members paid for FPI, whether class members voluntarily chose to accept FPI, and whether class members obtained FPI at a lower rate than they would have on the open market. *Id.* at *9.